OPINION
{¶ 1} Appellant, Holly Henson, appeals the summary judgment entered in favor of her former employer, appellee Cleveland Steel Container Corporation, by the Portage County Court of Common Pleas. At issue is whether a genuine issue of material fact existed on appellant's intentional tort claim. For the reasons that follow, we affirm in part and reverse in part.
 {¶ 2} Appellant was hired by appellee in March, 2005, first as a temporary employee and then as a full-time press operator in July, 2005 at appellee's facility in Streetsboro, Ohio. The Streetsboro plant manufactures lids for steel pails. *Page 2 
 {¶ 3} Appellant worked in the fittings department, which had ten press machines. The use of a press was determined by the type of die installed in the machine. Some presses were used to punch holes in the lids to allow for the insertion of a fitting, while others were used to stamp a fitting into the hole. Fittings can be stamped in two ways: (1) the fitting can be inserted by placing the fitting over the cover hole and then placing both items in the press; or (2) the fitting can be inserted by placing the fitting onto a slide outside the path of the press, placing the lid on the fitting and sliding both items into the press. In either instance, the operator would then press a foot pedal to bring the press down on the fitting.
 {¶ 4} Placing fittings onto the slide allowed an operator to use the press without putting his or her hand into the die. At appellee's facility, there were no punch press operations that required an operator to place a fitting directly into a die by hand.
 {¶ 5} Appellee also required its punch press operators to wear wrist restraints when operating a press that prevented them from being able to place their hands under the die. The wrist restraints consisted of straps that are fastened around the wrist of each arm at one end and to a pole behind the operator at the other end.
 {¶ 6} At all relevant times, Michael Svec was the manufacturing manager of the fittings department. He was the supervisor of all employees in this department, including all press operators such as appellant and Chris Masowick, the team leader, and Marcus Chapman, a material handler. As team leader, Mr. Masowick supervised the press operators and oversaw the daily operations of the department. He reviewed the daily production schedules, which were prepared by management, and determined what fittings each operator would need for the day. Marcus Chapman, as a material handler, brought the fittings to the operator and, after the operator completed his or her *Page 3 
work, he would retrieve the completed lids and they would then be prepared for shipping.
 {¶ 7} Appellant testified Mr. Svec trained her for three days in the operation of the presses and the use of the wrist restraints. He told her that her hands had to be at least one inch away from the pinch point, and showed her how to adjust the restraints so that, even with both hands outstretched, they would be at least one inch away from the pinch point.
 {¶ 8} Appellant testified appellee made sure employees were using their wrist restraints by conducting periodic checks, which, according to Mr. Svec, occurred at least two times a month. Appellant testified Mr. Svec made these checks to make sure that operators were wearing their wrist restraints and that they were adjusted properly.
 {¶ 9} Appellant testified the operators were also required to verify on "wrist restraint sheets" that their wrist restraints were being used and were properly adjusted each time they changed fittings or a die or each time they stopped and then resumed working. If an operator failed to wear wrist restraints and this was brought to Mr. Svec's attention, he would take disciplinary action against the employee. Operators were given verbal and then written warnings if they operated a press without using wrist restraints, and additional violations could result in termination.
 {¶ 10} Mr. Svec held regular meetings every other month for the fittings department at which he addressed safety issues, such as the proper use of the wrist restraints. The general manager Chris Capel also held monthly plant safety meetings at which he discussed safety issues in the plant.
 {¶ 11} On August 30, 2005, Mr. Svec saw appellant operating a punch press while not wearing her wrist restraints. He immediately stopped her and warned her and *Page 4 
told her never to operate a press again without using wrist restraints. He also gave appellant a written "last chance warning." The written warning, dated August 30, 2005, provided:
 {¶ 12} "Today, I witnessed Holly not wearing wrist restraints * * * while operating fitting press 10. During [department] meetings, I have * * * cautioned the entire department of the injuries that could occur from the lack of wearing the required wrist restraints. Because it's my responsibility to ensure the safety of all operators I have to document this occurrence and put a copy of this letter into your personnel file.
 {¶ 13} "This is a last chance warning for not adhering to company safety policies (NOT WEARING WRIST RESTRAINTS). The next occurrence will result in a more severe disciplinary action up to and possible termination." (Emphasis sic.) After Mr. Svec wrote this memo, he reviewed it with appellant, and put it in her personnel file.
 {¶ 14} Appellant testified she understood that if she got caught again not wearing her wrist restraints while operating a press, she would be terminated.
 {¶ 15} Appellant stated that at the regular departmental meetings, Mr. Svec discussed the need to wear wrist restraints, and that one of these meetings occurred after she was disciplined for not wearing her wrist restraints.
 {¶ 16} Appellant testified that on one occasion while assisting Marcus in operating a punch press, he showed her a shortcut to increase her speed by placing the fitting directly on the die without using wrist restraints. Marcus testified that no one taught him how to do this; he just started doing it on his own. Appellant admitted that neither Mr. Svec nor Mr. Masowick had ever told her to place fittings on the die by hand without wrist restraints, and she never told them or any other supervisor or member of management or anyone else that she was doing this. This shortcut was dangerous and *Page 5 
violated appellant's policy and procedures and the training appellant had received regarding the mandatory requirement that all operators use wrist restraints whenever operating the presses.
 {¶ 17} It is undisputed that Marcus was not part of management. He was not appellant's supervisor, nor did he have any supervisor-related responsibilities. He did not give employees their work assignments, make employee evaluations, give permission for employees to leave early, or discipline employees. No employees reported to him. As a "material handler," he was an hourly employee who, in addition to occasionally operating the presses to fill in for absent employees, would bring fittings to the operators to allow them to do their work and then collect the completed product after the punch press operation was performed.
 {¶ 18} Appellant worked the first shift, which was from 7:00 a.m. to 3:30 p.m. The practice in the fittings department was that the employees, approximately eight, stayed until each of them had completed their orders for the day. If one or more had not finished by 3:30 p.m., other employees would assist them. However, appellant testified only Mr. Svec could decide whether the shift had to stay. The employees were taught that only one person can perform the actual punch press operation, and that person must wear the wrist restraints at all times. The assisting employee would help by performing the duties of a material handler by bringing new fittings to the operator and then taking the completed product away after the press operation was performed. This eliminated two of the steps the operator would otherwise have to make and thus allowed them to finish their work faster.
 {¶ 19} Appellant testified she used the shortcut Marcus showed her whenever she helped an operator near or after the end of her shift, although she admitted that *Page 6 
after 3:30 p.m., the company's safety rules still applied and that the press operators would still be required to use wrist restraints. She testified that she assisted operators about 15 times during her tenure by putting the fittings directly on the die without using the wrist restraints; that she could finish about 1,000 fittings an hour; that she typically worked two hours each time she helped an operator finish her work; so that she had taken this shortcut thousands of times. She testified she did not know if any other operator ever did this and she never told Mr. Svec or Mr. Masowick she was taking this shortcut. She said that neither Mr. Svec nor Mr. Masowick ever told her to operate a press without wrist restraints; she did it because Marcus said it was faster.
 {¶ 20} On the day of her accident, January 17, 2006, at approximately 3:30 p.m., appellant had finished her work and asked Mr. Masowick and Marcus if she should help Vickie Prosser or Dody Hanna, other press operators, finish their work. They told her, "just help Vickie."
 {¶ 21} Appellant then brought new fittings to Ms. Prosser, who worked at press number 4. This press had guards on both sides and in the front with an opening in the front in which the operator could put the fitting. Appellant testified the grating was installed so the operator would not get hurt. She said it would prevent an operator from putting her hands in the pinch point. The 4 press also had a slide device leading to the die on which the operator was to place the fitting. The slide allowed parts to be inserted without danger of the operator coming near the pinch point under the die. This press also had wrist restraints, and, despite the other safety features of this press, use of the wrist restraints on this press was mandatory.
 {¶ 22} Appellant began placing fittings into Ms. Prosser's punch press by hand directly into the die without using the slide and without wearing wrist restraints. Ms. *Page 7 
Prosser placed the lid over the fitting and then stepped on the foot pedal to activate the press. Ms. Prosser testified that she knew press number 4 was a one-person operation and that appellant was not wearing wrist restraints in violation of appellee's rules and safety procedures. She said she did not stop appellant in order to avoid a rebuke from her. Appellant and Ms. Prosser continued operating the press in this way for about 30 minutes "talking and laughing and not paying attention." Appellant admitted the die on press 4 had a slide and she could have put the fitting on the slide, but she did not because the way Marcus had showed her was faster. At one point, while appellant was reaching with one hand for more fittings and her other hand was still under the die, Ms. Prosser accidently stepped on the pedal, bringing the die down, partially severing three of appellant's fingers. While Mr. Masowick and Marcus testified they were in the area, neither of them had been watching appellant's work nor did they see the accident. Their attention was drawn to it when they heard her screaming. Mr. Svec ran over to her, wrapped her hand and sat with her on the floor until the paramedics arrived and took her to the hospital.
 {¶ 23} Both Mr. Svec and Mr. Masowick testified they had never seen appellant or any other operator ever assist another operator by putting fittings into the die with her hands without using wrist restraints. Mr. Masowick also testified he had never seen any operator operate a press while not wearing wrist restraints.
 {¶ 24} Prior to appellant's accident, OSHA had never cited appellee for any incident involving an employee operating a press without wearing wrist restraints.
 {¶ 25} Appellee had installed wrist restraints on its presses some years earlier after an operator had injured her thumb on a press when she reached into the press while pressing the foot pedal. Following the installation of the wrist restraints, only one *Page 8 
injury had occurred involving the improper use of the restraints. In that incident, which occurred in December, 2005, an operator Teresa Smith was operating a press while her wrist restraints were too loose. The press came down on her hand, but she was not injured. Appellant was working near Ms. Smith at the time and was aware of her "near-miss" accident. After this incident Mr. Svec met with the operators, including Ms. Smith and appellant, and reminded them that they are required to properly use the wrist restraints whenever they operate their presses. In a memo, prepared by Mr. Svec on December 13, 2005 regarding "Fitting [Department] Meeting and Press Safety because of a near miss accident on December 12, involving Teresa Smith on [press number] 6," he stated:
 {¶ 26} "Today, a meeting was held to review our safety policy on wearing and adjusting wrist restraints.
 {¶ 27} "Subjects covered:
 {¶ 28} "1. Wrist restraint policy[,]
 {¶ 29} "2. Wrist restraint adjustments * * *[,]
 {¶ 30} "3. Zero tolerance hands in die policy[,]
 {¶ 31} "4. Don't take risks."
 {¶ 32} Appellant testified that at this meeting, Mr. Svec told everyone that they must make sure they are wearing their wrist restraints when operating the press.
 {¶ 33} Following her injury, appellant filed a worker's compensation claim, which has been approved, and she is presently receiving benefits under this award.
 {¶ 34} Appellant also filed a complaint in the Cuyahoga County Court of Common Pleas, alleging a cause of action for employer intentional tort and seeking a declaration that R.C. 2745.01 is unconstitutional. Upon appellee's motion, that court transferred the *Page 9 
complaint to the trial court. After the parties engaged in extensive discovery, including the depositions of the parties and witnesses, appellee filed a motion for summary judgment, which was opposed by appellant. The trial court granted the motion. Appellant timely appeals the trial court's summary judgment, asserting two assignments of error. For her first assigned error, appellant contends:
 {¶ 35} "THE TRIAL COURT ERRED, AS A MATTER OF LAW, FAILING TO HOLD THAT R.C. 2745.01 (A)'S IMPOSITION OF A `DELIBERATE INTENT STANDARD UPON WORKPLACE INTENTIONAL TORTS IS UNCONSTITUTIONAL AND BY GRANTING DEFENDANT-APPELLEE'S MOTION FOR SUMMARY JUDGMENT."
 {¶ 36} Appellant argues that the current version of R.C. 2745.01(A), which governs causes of action premised upon employer intentional torts, is unconstitutional, and that the trial court erred, in granting summary judgment to appellee, on the basis of this statute. Appellant contends the current version of R.C. 2745.01, effective April 7, 2005, is unconstitutional because it essentially mirrors former R.C. 2745.01, which was declared unconstitutional in Johnson v. BP Chemicals,Inc., 85 Ohio St.3d 298, 1999-Ohio-267.
 {¶ 37} Current R.C. 2745.01, provides, in relevant part:
 {¶ 38} "(A) In an action brought against an employer by an employee * * * for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur. *Page 10 
 {¶ 39} "(B) As used in this section, `substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death."
 {¶ 40} This court has had occasion to rule on the constitutionality of this statute in Fleming v. AAS Service, Inc., 177 Ohio App.3d 778,2008-Ohio-3908, in which this court held:
 {¶ 41} "* * * [U]nder the current statute, an employer's conduct must be either intentional or deliberately intentional. As the [Supreme Court] in Johnson[, supra,] pointed out, these requirements `are so unreasonable and excessive that the chance of recovery of damages by employees for intentional torts committed by employers in the workplace is virtually zero. * * * [This] "creates an insurmountable obstacle for victims of `employment intentional torts.'"'Id. at 307. By requiring an employee to demonstrate his employer acted with an `intent to injure' or `with the belief that the injury was substantially certain to occur' (i.e., acting with `deliberate intent' to injure), creates an unreasonably high standard of proof which does not provide for the `comfort, health, safety and general welfare of all employees * * *.'Brady [v. Safety-Kleen Corp. (1991), 61 Ohio St.3d 624], 633.
 {¶ 42} "* * *
 {¶ 43} "We therefore hold, pursuant to Brady, Johnson, as well as the supplemental persuasive analysis set forth in Kaminski [v. Metal WireProducts Company, 175 Ohio App.3d 227, 2008-Ohio-1521], current R.C. 2745.01 is unconstitutional, standing in violation of Sections 34 and35, Article II of the Ohio Constitution. As a result, the common law standard set forth in Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, is again the viable standard of proof for an employee *Page 11 
seeking redress for an employer's allegedly intentional tortious conduct." Fleming at 790-793.
 {¶ 44} Appellant's first assignment of error is well taken.
 {¶ 45} For her second assigned error, appellant asserts:
 {¶ 46} "THE TRIAL COURT ERRED, AS A MATTER OF LAW, BY IMPROPERLY GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT-APPELLEE ON PLAINTIFF-APPELLANT'S WORKPLACE INTENTIONAL TORT CLAIM."
 {¶ 47} As noted in our analysis under appellant's first assignment of error, since current R.C. 2745.01(A) is unconstitutional, we followFyffe, supra, in analyzing appellant's employer intentional tort claim.
 {¶ 48} Pursuant to Civ. R. 56(C), summary judgment is proper if: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and, viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327.
 {¶ 49} The party seeking summary judgment initially bears the burden of informing the trial court of the basis for the motion and identifying portions of the record demonstrating an absence of genuine issues of material fact as to the essential elements of the nonmoving party's claims. Dresher v. Burt, 75 Ohio St.3d 280, 293, 1996-Ohio-107. The movant must point to some evidence in the record of the type listed in Civ. R. 56(C) in support of his motion. Id. Once this burden is satisfied, the nonmoving *Page 12 
party has the burden, as set forth in Civ. R. 56(E), to offer specific facts showing a genuine issue for trial. Id. The nonmovant may not rest upon the mere allegations and denials in the pleadings, but instead must point to some evidentiary material that shows a genuine dispute over the material facts exists. Henkle v. Henkle (1991), 75 Ohio App.3d 732, 735.
 {¶ 50} Appellate review of a trial court's entry of summary judgment is de novo, applying the same standard used by the trial court.McKay v. Cutlip (1992), 80 Ohio App.3d 487, 491.
 {¶ 51} The remedy provided under Ohio's workers' compensation laws was made the exclusive remedy for workplace injury available to employees by the amendment to Article II, Section 35 of the Ohio Constitution in 1924. It granted immunity to complying employers from any common-law actions for injuries suffered by employees in the workplace.
 {¶ 52} Thus, in general, an employee's only recourse for a workplace injury is through the workers' compensation system. In Blankenship v.Cincinnati Milacron Chemicals, Inc. (1982), 69 Ohio St.2d 608, the Supreme Court of Ohio first recognized the intentional tort exception to the workers' compensation exclusivity doctrine by allowing employees to bring an intentional tort claim against their employers. This narrow exception exists when an employer's conduct is sufficiently "egregious" to constitute an intentional tort. Sanek v. Duracote Corp. (1989),43 Ohio St.3d 169, 172. The Court defined the term "intentional tort" inJones v. VIP Development Co. (1984), 15 Ohio St.3d 90, as "an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." Id. at paragraph one of the syllabus. In the context of employer intentional torts, "intent" focuses primarily on *Page 13 
whether an employer is substantially certain a particular condition will cause injury to an employee. Id.
 {¶ 53} In Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100, the Supreme Court of Ohio held that knowledge and appreciation of a risk — something short of substantial certainty — is not intent. Id. at paragraph six of the syllabus. The Court further held that the threshold for establishing employer intentional tort is very high in light of the exclusivity of the workers' compensation system:
 {¶ 54} "There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an `intentional tort' * * *." Id. at 117.
 {¶ 55} The test for an employer intentional tort was set forth inFyffe, supra, in which the Court identified three elements an employee must prove: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id. at paragraph one of the syllabus. To withstand a motion for summary judgment, the employee must set forth specific facts that raise a genuine issue as to each element of the Fyffe three-prong test. Van Fossen, supra, at paragraph seven of the syllabus. *Page 14 
 {¶ 56} The Court in Fyffe explained this test as follows:
 {¶ 57} "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk-something short of substantial certainty — is not intent." Fyffe, supra, at paragraph two of the syllabus.
 {¶ 58} Thus, an employer intentional tort claim requires proof beyond that required to establish negligence, gross negligence, recklessness, or even wanton conduct. Mere knowledge and appreciation of a risk is not intent.
 {¶ 59} We begin our analysis by noting that the elements ofFyffe are conjunctive and that a plaintiff must establish a genuine issue of material fact regarding all three prongs of the test to avoid summary judgment. Fleming, supra, at 793-794.
 {¶ 60} To satisfy the first prong of the test, the plaintiff must demonstrate there was a dangerous process or condition in the workplace and the employer had actual knowledge of the consequences of the precisedangers which ultimately caused the injury. Id.; Sanek, supra;Hubert v. Al Hissom Roofing and Constr, Inc., 7th Dist. No. 05 CO 21,2006-Ohio-751, at ¶ 18. In Sanek, the Supreme Court of Ohio held: *Page 15 
 {¶ 61} "In a case such as this, the employee at all times has the burden to demonstrate that the employer had knowledge amounting to substantial certainty that an injury would take place. Pariseau v. WedgeProducts, Inc. (1988), 36 Ohio St.3d 124, 127 * * *. The focus of an intentional tort action under the standards set forth inBlankenship, Jones and Van Fossen, supra, is on the knowledge of the employer regarding the risk of injury. The plaintiff has the burden of proving by a preponderance of the evidence that the employer had"actual knowledge of the exact dangers which ultimately caused" injury.Van Fossen, supra, at 112." (Emphasis added.) Sanek, supra, at 172.
 {¶ 62} "[D]angerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach." Naragon v. Dayton Power Light Co. (Mar. 30, 1998), 3d Dist. No. 17-97-21, 1998 Ohio App. LEXIS 1531, *19. "Were it otherwise, any injury associated with inherently dangerous work * * * could subject an employer to intentional tort liability, whatever the cause." Id. Thus, under the first prong of the Fyffe test, appellant was required to present evidence that appellee had knowledge of the existence of the specific dangerous condition that caused her injury.
 {¶ 63} As a result, in order to avoid summary judgment, appellant was required to produce Civ. R. 56 evidentiary materials demonstrating that appellee knew she was placing fittings directly in the die without using wrist restraints. This she failed to do. Appellant concedes that she was trained by the manufacturing manager Michael Svec that whenever a press operator uses a press, he or she is required to use wrist restraints. Further, she testified that, when assisting other operators after the end of the shift, all safety rules still applied so that if she was going to operate a press, she would *Page 16 
have been required to use wrist restraints. Mr. Svec and Mr. Masowick testified they had never seen her or any other operator place fittings into the die without using wrist restraints. Appellant testified she never told either of them she was taking this shortcut.
 {¶ 64} Appellant argues that because Mr. Masowick and Marcus told her to help Vickie at the end of the shift and Vickie's press had only one set of wrist restraints, they essentially told her to operate the machine without restraints.
 {¶ 65} Appellant's argument ignores the undisputed evidence in this case that operators were trained by appellee that the punch presses are a one-person operation and that if an employee was asked to assist an operator, he was to act as a material handler only, i.e., bringing fittings to the operator and then collecting them after the operation had been performed on the press. The purpose of such assistance was to eliminate these additional steps so the operator could complete his work faster.
 {¶ 66} It is noteworthy that in August, 2005, appellant was given a "last chance warning" after being caught operating a press without wrist restraints.
 {¶ 67} In addition, after a near-miss accident in December, 2005, when another operator Teresa Smith failed to properly adjust her wrist restraints, Mr. Svec held a departmental meeting, at which appellant was present, in which he reminded the operators that they must use wrist restraints when operating the presses.
 {¶ 68} Appellant does not dispute the mandatory nature of appellee's rules requiring the use of wrist restraints and that it applied at all times when an operator was using a press. Since there is no evidence any member of management or any employee with supervisory authority had knowledge of appellant's use of this shortcut, we hold there is no genuine issue concerning whether appellee had knowledge of a dangerous condition within its business operation. *Page 17 
 {¶ 69} Appellant argues that because Mr. Svec testified it would be dangerous for appellant to assist Vickie by placing her hand in the pinch point without wrist restraints, this proves appellee had knowledge of the existence of a dangerous condition. However, because no member of management had knowledge that appellant was practicing her shortcut, knowledge of the existence of this dangerous condition cannot be attributed to appellee.
 {¶ 70} It is also worth pointing out that press 4, which appellant was operating at the time of her injury, had a guard on the sides and front of the pinch point. In addition, the die being used on this press had a slide device which would allow the operator to avoid placing the fitting directly on the die. Appellee would have had no way of knowing that appellant was intentionally avoiding use of the slide by directly placing the fitting in the die so she could finish the operation as fast as possible. For this additional reason, there is no evidence appellee had knowledge of a dangerous condition at its workplace.
 {¶ 71} We note that, by appellant's own testimony, when Mr. Masowick and Marcus told her to "just assist Vickie," they did not tell her to operate the press without wrist restraints. She testified that she assumed from Marcus' previous demonstration that she could operate the press without the use of the safety device. Such assumption was not reasonable, particularly in light of her training by the manufacturing manager Mr. Svec and her previous reprimand for violating appellee's policy.
 {¶ 72} Next, appellant argues that if no member of management was actually aware of her shortcut, appellee must be held to knowledge of this practice because Marcus, a material handler, had shown her the shortcut he practiced. She argues appellee is bound by Marcus' apparent authority. Appellant's argument fails for several reasons. *Page 18 
 {¶ 73} First, apparent authority is shown not by the acts of the apparent agent, but rather, by the acts of the principal. It is well settled that an agent can bind a principal under the doctrine of apparent authority where the principal holds the agent out to thepublic as having authority to act, and third parties reasonably believe the agent does have authority to act. Parker v. Protective Life Ins.Co., 11th Dist. Nos. 2004-T-0127 and 2004-T-0128, 2006-Ohio-4041, at ¶ 72; Master Consolidated Corp. v. BancOhio Natl. Bank (1991),61 Ohio St.3d 570, 576-577.
 {¶ 74} Whatever appellant might have subjectively thought about Marcus' duties, appellee did not put him in a position such that she could reasonably rely on his alleged authority to train her in a shortcut that was admittedly extremely dangerous and directly contrary to the company's policy about the use of wrist restraints and her training by Mr. Svec.
 {¶ 75} The undisputed evidence was that Marcus was not part of management. He was not appellant's supervisor. He was employed as a material handler, whose sole function was to bring fittings to the press operators and to operate the presses when filling in for absent press operators. Moreover, by appellant's own testimony, he did not have the attributes of a foreman or supervisor. She conceded he was not a salaried employee, but rather was paid by the hour. Mr. Svec was solely responsible for training the operators on the presses and concerning appellee's safety requirements. Marcus did not give work assignments to the employees; these were determined by management on the daily schedules and conveyed to them by Mr. Masowick, the team leader. Further, Marcus could not allow the employees to leave early. Neither appellant nor any other employee reported to Marcus; she only reported to Mr. Svec or Mr. Masowick. Marcus was in no way responsible for the operation of the presses. Marcus *Page 19 
had no role in the enforcement of appellee's safety requirements; in fact, appellant knew that the shortcut Marcus taught her violated appellee's policy and her training. Finally, Marcus did not evaluate the employees and could not discipline them. Thus, contrary to appellant's argument, there is no evidence in the record that Marcus performed any supervisor-type functions. All that appellant can point to is that, according to her, he taught her a shortcut, which she knew was in direct violation of the company's policy concerning wrist restraints about which she had been personally taught by the manager Mr.Svec and for which she was reprimanded for her violation of the policy.
 {¶ 76} Appellant also argues that, because Mr. Masowick was standing near press number 4 at the time of the accident, he must have seen her performing her shortcut. However, Mr. Masowick testified that, at the time, he was not watching appellant work and did not observe the accident. While appellant can testify to Mr. Masowick's location at the time of the accident, she is in no position to testify what he observed. Her testimony that he saw her put parts in the die is not supported by facts within her knowledge and cannot be relied on to avoid summary judgment.
 {¶ 77} Appellant's argument that in the past, some of the presses had "light curtains" on them that would cause them to stop if an operator's hands were near the pinch point is unavailing because appellant failed to assert this argument in the trial court in opposition to summary judgment. This court has held that, while the standard of review on a motion for summary judgment is de novo, that standard does not supersede our settled practice of not addressing issues raised for the first time on appeal. Chester Props. v. Hoffman (Oct. 26, 2001), 11th Dist. Nos. 2001-G-2333 and 2001-G-2334, 2001 Ohio App. LEXIS 4802, *8. In any event, there is no evidence in the record that press number 4 had such light curtains in the past; that they were ever *Page 20 
removed; or that the wrist restraints, slide device and guards were less effective than a light curtain.
 {¶ 78} Because there is no evidence in the record that appellee had knowledge of the existence of a dangerous condition in its workplace, appellant's argument lacks merit.
 {¶ 79} However, even if there had been evidence of such knowledge, there is no evidence in this record that appellant knew that if appellant was subjected to this dangerous condition, injury was a substantial certainty.
 {¶ 80} It is well settled that "[a]n employer simply cannot be held to know that a dangerous condition exists and that harm is substantially certain to occur when he has taken measures that would have prevented the injury altogether had they been followed." Robinson v. Icarus Indus.Constructing Painting Co., Inc. (2001), 145 Ohio App.3d 256, 262.
 {¶ 81} After a previous injury in the plant, appellee instituted a policy requiring all press operators to wear wrist restraints whenever they operated a press. The purpose of this policy was to keep the operators' hands away from the pinch point. The policy was mandatory, and the company took a "zero tolerance" position with respect to this policy. Appellant was issued a "last chance warning" for failing to wear the wrist restraints when operating her press. The warning itself advised her in writing that if there was another instance of her failing to wear the restraints, she would face more serious discipline, which could include termination. Under any reasonable standard, appellee took measures that would have prevented appellant's injury had she followed them. *Page 21 
 {¶ 82} We also note there is no evidence in this case of any previous similar injury. While operator Teresa Smith had a "near-miss" accident as a result of not properly adjusting the wrist restraints, there had never been an incident where a press operator had been injured as a result of not wearing her wrist restraints. While evidence of no prior accidents, standing alone, is not conclusive, it strongly suggests that injury from the procedure was not substantially certain to result.Richardson v. Welded Tubes, Inc., 11th Dist. No. 2007-A-0069,2008-Ohio-2920, at ¶ 70, discretionary appeal not allowed,2008-Ohio-6166. See Foust v. Magnum Restaurants, Inc. (1994),97 Ohio App.3d 451, 455 (holding that while evidence of no prior accidents, standing alone, is not conclusive, it strongly suggests that injury from the procedure was not substantially certain to result); see, also,Knott v. Bridgestone/Firestone Tire and Rubber Co. (Sep. 25, 1996), 9th Dist. No. 17829, 1996 Ohio App. LEXIS 4158 (affirming summary judgment in favor of the employer based on the lack of prior accidents from hydraulic lift malfunctioning); Clark v. Cargill, Inc. (Feb. 12, 1999), 6th Dist. No. L-98-1225, 1999 Ohio App. LEXIS 405 (holding that the lack of prior injuries was a significant factor in determining substantial certainty); Youngbird v. Whirlpool Corp. (1994), 99 Ohio App.3d 740, 747
(holding that two other accidents were neither similar enough nor close enough in time to be relevant to the conditions present at the time of Youngbird's injury).
 {¶ 83} We also note that OSHA had not previously cited appellee for the violation of any safety regulation arising from the failure of an employee to use wrist restraints.
 {¶ 84} We therefore hold that even if appellant had presented evidence on the first prong of the Fyffe test, she failed to present any evidence to satisfy the second prong. *Page 22 
 {¶ 85} Finally, even if appellant had presented evidence under the first two prongs of Fyffe, there is no evidence in the record that appellee, with knowledge that injury from exposure to the dangerous condition was a substantial certainty, required appellant to continue to perform the dangerous task. Because we find that appellee was unaware of the shortcut appellant was taking when operating the presses in that no member of management or any supervisor knew what she was doing, appellant cannot avoid summary judgment with respect to the third prong of the Fyffe test.
 {¶ 86} As noted supra, appellant had instituted and enforced a mandatory policy requiring the use of wrist restraints. By appellant's own admission, appellee's manager regularly checked the plant to make sure its employees were using the restraints and on one occasion appellant was reprimanded for not using the restraints. Appellant does not dispute that she was trained by the manager Mr. Svec that she was always required to use the restraints when operating the presses. We find it incredible that in these circumstances appellant argues appellee required her not to wear wrist restraints when operating the presses. In light of the steps taken by appellee to enforce its policy, we find it difficult to conceive what else it could have done to get appellant to follow it other than to hire a full-time employee whose sole function would be to monitor appellant's activities to make sure she wore the wrist restraints.
 {¶ 87} Appellant's second assignment of error is not well taken.
 {¶ 88} For the reasons stated in the Opinion of this court, it is the judgment and order of this court that the judgment of the Portage County Court of Common Pleas is affirmed in part and reversed in part.
DIANE V. GRENDELL, J., concurs in judgment only with Concurring Opinion, *Page 23 
COLLEEN MARY O'TOOLE, J., dissents.